## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STEPHEN MAITLAND-LEWIS, Individually and on Behalf of All Other Persons Similarly Situated, | : : : : | **Civil Action No.:** |
| Plaintiff, | : : : | **[CORRECTED]** ~~AMENDED~~ **CLASS ACTION** ~~COMPLAINT~~ |
| v. | : : : | JAN 2 4 2014 |
| BARNES & NOBLE, INC., MICHAEL P. HUSEBY, WILLIAM J. LYNCH, JR., and ALLEN W. LINDSTROM, | : : : : | U.S.D.C. S.D. N.Y. CASHIERS |
| Defendants. | : : | **JURY TRIAL DEMANDED** |

Plaintiff Stephen Maitland-Lewis ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his corrected amended complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Barnes & Noble, Inc. ("Barnes & Noble" or the "Company"), analyst reports and advisories about the Company, and information readily obtainable on the Internet.

### NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Barnes & Noble securities between June 27, 2012 and December 5, 2013, inclusive (the "Class Period"), seeking to recover damages caused by

defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2.      Barnes & Noble is one of the nation's largest booksellers, providing customers easy and convenient access to books, magazines, newspapers and other content across its multi-channel distribution platform. As of April 27, 2013, the Company operates 1,361 bookstores in 50 states, including 686 bookstores on college campuses, operates one of the Web's largest eCommerce sites and develops digital reading products and operates one of the largest digital bookstores.

3.      Of the 1,361 bookstores, 675 operate primarily under the Barnes & Noble Booksellers trade name. Barnes & Noble College Booksellers, LLC (B&N College) operates 686 college bookstores at colleges and universities across the United States. Barnes & Noble Retail (B&N Retail) operates the 675 retail bookstores. Retail also includes the Company's eCommerce site and Sterling Publishing Co., Inc. (Sterling or Sterling Publishing), a leader in general trade book publishing. The NOOK segment represents the Company's digital business, offering digital books and magazines for sale and consumption through the web, NOOK ® reading devices and reading software for iOS, Android and Windows 8.

4.      In the past several quarters the Company has noted the underperformance in its NOOK division, and has reported inventory charges related to the lackluster sales of the Company's NOOK tablet.

5.      On June 25, 2013, the Company announced that it would not be able to file its annual report on time, and would need to evaluate its prior financial statements in order to provide investors with accurate financial statements. The Company stated in relevant part:

> The Annual Report on Form 10-K of Barnes & Noble, Inc. (the "Company") for the fiscal year ended April 27, 2013 (the "2013 10-K") will not be filed with a filing date of June 26, 2013 (the "Filing Deadline"). As previously announced, the Company is currently in the process of evaluating certain prior year amounts, which may result in a revision to the financial statements. The Company's analysis is ongoing, but it does not believe these amounts will be material to the financial statements. As the Company is currently still evaluating certain prior year amounts, the Company was not able to complete and file the 2013 10-K prior to the Filing Deadline. Also, the Company's ongoing evaluation of prior year amounts may result in revisions to its previously filed financial statements and changes to the financial information presented in its press release furnished with the Securities Exchange Commission as an exhibit to Form 8-K on June 25, 2013.

6.     On this news the Company's shares fell $3.21 to close on June 25, 2013 at $15.61 per share, a one day decline of 17% on volume of nearly 9 million shares.

7.     Then, on December 5, 2013, the Company announced in its Form 8-K, that, "on October 16, 2013, the SEC's New York Regional office notified the Company that it had commenced an investigation into: (1) the Company's restatement of earnings announced on July 29, 2013, and (2) a separate matter related to a former non-executive employee's allegation that the Company improperly allocated certain Information Technology expenses between its NOOK and Retail segments for purposes of segment reporting. The Company is cooperating with the SEC, including responding to requests for documents."

8.     On this news, Barnes & Noble securities declined $1.96 per share, or over 11%, to close at $14.43 per share on December 6, 2013, on volume of over 7 million shares.

9.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Nook sales were significantly diminishing during the

Company's fourth quarter 2013 (ended April 27, 2013); (2) the Nook segment was on track to lose money and the Company was not committed to sustaining the money losing segment; (3) the Company engaged in improper accounting practices, including by inappropriately allocating expenses between the Company's NOOK and Retail segments; (4) the Company lacked adequate internal controls over financial reporting; and, (5) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as the Company is headquartered in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

4

15.     Plaintiff, as set forth in the attached certification, purchased Barnes & Noble securities at artificially inflated prices during the Class Period and has been damaged by the revelation of the alleged corrective disclosures.

16.     Defendant Barnes & Noble is a Delaware corporation with its executive offices located at 122 Fifth Avenue, New York, NY 10011. The common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BKS."

17.     Defendant Leonard Riggio ("Riggio") founded Barnes & Noble's corporate predecessor in 1965 and has served as its Chairman since 1985. Defendant Riggio, who owns nearly 30% of Barnes & Noble's common stock, is also the principal beneficial owner of MBS Textbook Exchange, Inc., a Columbia, Missouri-based wholesaler of college textbooks.

18.     Defendant Michael P. Huseby ("Huseby") was at all relevant times the Company's President and Chief Executive Officer of NOOK Media LLC.

19.     Defendant William J. Lynch, Jr. ("Lynch") was formerly the Chief Executive Officer of Barnes & Noble.

20.     Defendant Allen W. Lindstrom ("Lindstrom") was at all relevant times the Company's Chief Financial Officer.

21.     The defendants referenced above in ¶¶ 17 – 20 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Barnes & Noble is one of the nation's largest booksellers, providing customers easy and convenient access to books, magazines, newspapers and other content across its multi-channel distribution platform. As of April 27, 2013, the Company operates 1,361 bookstores in

50 states, including 686 bookstores on college campuses, operates one of the Web's largest eCommerce sites and develops digital reading products and operates one of the largest digital bookstores.

### Materially False and Misleading
### Statements Issued During the Class Period

23.     On June 27, 2012, the Company filed with the SEC an annual report on Form 10-K. For the fiscal year ended April 27, 2013, the Company total sales of $6.8 billion and a operating loss of $157.8 million, resulting in diluted losses of $3.02 per share.

24.     The Company further itemized revenues and expenses by its Retail, College and NOOK segments and reported the following regarding each segment:

> B&N Retail sales for the 52 weeks ended April 27, 2013 decreased $284.7 million, or 5.9%, to $4.57 billion from $4.85 billion during the same period one year ago, and accounted for 66.8% of total Company sales. The decrease was primarily attributable to a 3.4% decrease in comparable store sales which decreased sales by $138.4 million, lower online sales which declined by $83.5 million, and closed store sales which decreased sales by $68.0 million. Core comparable store sales, which exclude sales of NOOK ® products, increased 0.1% as compared to the prior year. Sales of NOOK ® products declined due to lower unit volume. B&N Retail also includes third-party sales of Sterling Publishing Co., Inc.

> B&N College sales increased $19.6 million, or 1.1%, to $1.76 billion during the 52 weeks ended April 27, 2013 from $1.74 billion during the 52 weeks ended April 28, 2012. This increase was attributable to a $76.5 million increase in new store sales partially offset by $16.0 million of store closures as well as a comparable store sales decrease of 1.2%, or $41.9 million. While comparable store sales are adjusted for the impact of textbook rentals, total sales dollars are negatively impacted by the continued growth of textbook rentals, which have a lower price than new or used textbooks, and a portion of rental sales are deferred over the rental period. This decrease is partially offset by higher general merchandise sales.

> NOOK sales decreased $153.0 million, or 16.4%, to $780.4 million during the 52 weeks ended April 27, 2013 from $933.5 million during the 52 weeks ended April 28, 2012. This decrease was primarily due to lower device unit volume and lower average selling prices, partially offset by

higher content sales. Digital content sales increased 16.2% during the 52 weeks ended April 27, 2013.

25.    On August 31, 2012, the Company filed a quarterly report for the period ended July 28, 2012 on a Form 10-Q. In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Lynch and Huseby stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

26.    Regarding its segment reporting the Company stated in relevant part:

> Through the third quarter of fiscal 2012, the Company reported an operating segment titled B&N.com which included both its digital business and eCommerce operations. Due to the increased focus on the digital business and the Company's recently developed ability to review the digital business separate from its eCommerce business, the Company performed an evaluation on the effect of its impact on the identification of operating segments. The assessment considered the way the business is managed (focusing on the financial information distributed) and the manner in which the chief operating decision maker interacts with other members of management. As a result of this assessment, during the fourth quarter of fiscal 2012 the Company determined that the segment previously referred to as B&N.com is no longer applicable and created a new segment titled NOOK to report upon its digital business, moving the eCommerce business (i.e., sales of physical merchandise over the Internet) into the B&N Retail segment. Also as a result of this assessment, certain corporate office and other costs have been allocated to all three segments. The Company's three operating segments are: B&N Retail, B&N College and NOOK.

> ***

> Selling and administrative expenses decreased $1.1 million, or 0.3%, to $410.0 million during the 13 weeks ended July 28, 2012 from $411.1 million during the 13 weeks ended July 30, 2011. Selling and administrative expenses decreased as a percentage of sales to 28.2% from 29.0% during the same period one year ago. The increase or (decrease) by segment is as follows:

> B&N Retail selling and administrative expenses decreased as a percentage of sales to 23.4% from 24.7% during the same period one year ago. The current year selling and administrative expenses included the reversal of an incentive compensation accrual related to fiscal 2012. Excluding this

item, selling and administrative expenses as a percentage of sales would have decreased to 23.7% from 24.7% during the same period one year ago. This decrease was primarily due to improved store productivity.

B&N College selling and administrative expenses increased as a percentage of sales to 29.5% from 28.7% during the same period one year ago primarily due to new store openings and increased expenses for digital higher education initiatives.

NOOK selling and administrative expenses decreased as a percentage of sales to 73.0% from 76.5% during the same period one year ago. The current year selling and administrative expenses included the reversal of an incentive compensation accrual related to fiscal 2012. Excluding this item, selling and administrative expenses as a percentage of sales would have decreased to 76.0% from 76.5% during the same period one year ago. Expenses increased $5.8 million for the quarter primarily to support international expansion plans as well as increased advertising.

27.     On December 6, 2012, the Company filed a quarterly report for the period ended October 27, 2012 on a Form 10-Q with the SEC signed by Defendants Lynch and Huseby, which reiterated the Company's previously reported financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Lynch and Huseby stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

28.     Regarding cost of sales attributable to its various segments the Company stated in relevant part:

B&N Retail cost of sales and occupancy decreased as a percentage of sales to 70.2% from 71.7% during the same period one year ago. This decrease was primarily attributable to a higher mix of higher margin core products, and increased vendor allowances.

B&N College cost of sales and occupancy remained flat as a percentage of sales at 77.9% as compared to the same period one year ago.

NOOK cost of sales and occupancy remained relatively flat as a percentage of sales at 80.3% versus 80.0% during the same period one year ago. This decrease was primarily due to a higher mix of higher margin content sales, partially offset by lower device margins on lower

average selling prices and higher occupancy costs on increased office space in Palo Alto, CA.

29.     On February 25, 2013, in response to rumors that began swirling in the financial media early in the day before the opening of trading that Defendant Riggio had approached the Barnes & Noble Board about taking the Company's booksale business private, Barnes and Noble issued a press release stating, in pertinent part, as follows:

> Barnes & Noble, Inc. [BKS], the leading retailer of content, digital media and educational products, today announced that its Board of Directors has received notice from Mr. Leonard Riggio, the Company's founder, largest stockholder and Chairman of the Board, that *Mr. Riggio plans to propose to purchase all of the assets of the retail business of Barnes & Noble.* Mr. Riggio's plans with respect to a proposal are set forth in an amendment to his Schedule 13D filed today with the SEC.
>
> The process of evaluating a proposal and negotiation of any transaction will be overseen by a Strategic Committee of three independent directors: David G. Golden, David A. Wilson and Patricia L. Higgins, who is Chair of the Strategic Committee.  The Strategic Committee has selected Evercore Partners to serve as its financial advisor and Paul, Weiss, Rifkind, Whation & Garrison LLP to serve as its legal advisor.
>
> There can be no assurance that the review of Mr. Riggio's proposal or the consideration of any transaction will result in a sale of the retail business or in any other transaction. There is no timetable for the Strategic Committee's review. The Company does not intend to comment further regarding the evaluation of Mr. Riggio's proposal, unless and until definitive agreements for a transaction are entered into or the Strategic Committee determines to conclude the process.[1]

30.     Because the press release concealed the *reasons* that Defendant Riggio wanted only the Retail segment, and specifically, why Defendant Riggio did not want to acquire the NOOK segment, the market was elated. On this news, the Company's stock price closed up more than $1.50 per share on February 25, 2013, or more than 10%, on unusually high trading volume of more than 6.5 million shares trading, or more than five times the average daily trading volume over the preceding ten trading days.

31.     Then on February 28, 2013, the Company issued a press release announcing its third quarter 2013 financial results (for the interim quarter ended January 26, 2013) and fiscal year 2013 financial guidance (for the interim quarter and fiscal year ending April 27, 2013). The Company reported a third-quarter loss amid weak Nook sales and a slowdown in its retail stores. However, the price of Barnes & Noble's stock climbed more than 8% in intraday trading after Defendant Lynch spoke during a conference call following the issuance of the press release confirming that the Company was indeed actively considering Defendant Riggio's bid to take the B&N Retail assets private, with Defendant Lynch stating: "We can't comment further on Len Riggio's plan to make a proposal to purchase the Retail business, ***other than to confirm ongoing discussions between Len and the Strategic Committee*** *of the Board.*" Defendant Lynch also confirmed plans for NOOK Media to be self-sufficient financially by managing costs and generating cash flow in the B&N College segment and said the Company had already taken steps to significantly reduce the costs and overhead of the digital consumer business. During the conference call, Defendant Lynch repeatedly emphasized the strength of the Company's Nook business, confirming the Company was still committed to Nook tablet production, stating, in pertinent part, as follows:

> Since we launched the digital business in 2009, we've ramped expenses in capital quickly to build out the platform and fuel the growth. The results of this investment is that *we built one of the world's most valuable catalogs of digital copyright content for books, magazines and educational materials, as well as a digital bookstore service that contains approximately a 25% share of the eBook market and an over 35% share of the digital subscription market in the U.S.* We are working to complete the global expansion of the NOOK digital content and retailing service in approximately 10 countries, selling in over 10 languages by this summer. Now that we have built this global asset, we are actively in discussions to leverage our valuable technology and content platform to sell digital content through partnerships. Similar to the partnership, we struck with Microsoft on Windows 8. Partnerships are one of the key strategies for

---

[1] All emphasis is added unless otherwise noted.

growth for our NOOK digital content business and *we are encouraged by the status and breadth of discussions we're in the midst of.* Even with the decline in NOOK unit sales in Q3, we grew digital content sales 7%, so we've demonstrated we can grow our content business without having to grow hardware sales.

*At the same time, I want to be clear about the fact that we continue to remain committed to the e-Reader and Tablet business going forward.* We're extremely proud of the award-winning line of products we've created. In fact, we're proud of all the products we ship, including our mobile apps for iOS and Android, which are the highest-rated reading apps in both iTunes and Google Play. From a marketing and sales standpoint, regardless of what happens, our bookstores and NOOK will continue to have a close relationship for the foreseeable future. *Our bookstores have made a significant contribution to NOOK's success over the past three years, and in turn, our award-winning line of NOOK products has proven to be a strong driver of traffic to our stores.*

32.     Defendant Huseby also provided the following fourth quarter and fiscal 2013 guidance during the February 28th earnings conference call:

For fiscal 2013, the company continues to expect retail comparable bookstore sales to decline on a percentage basis in the low to mid-single digits. College comparable store sales are now expected to decline on a percentage basis in the low single digits. NOOK Media revenue, which includes the NOOK and College businesses, is expected to be approximately $2.5 billion for the year.

The company now expects fourth quarter NOOK segment EBITDA losses to be comparable to last year's fourth quarter loss of $77 million. Given the holiday device sales shortfall and the associated impact on subsequent digital content sales, coupled with the previously discussed product and component inventory markdowns totaling $74 million, *the company now expects fiscal year 2013 NOOK segment EBITDA losses of approximately $375 million.*

33.     As a result Defendants' bullish mantra about the status of the buyout talks with Defendant Riggio and the Nook segment's purported impending turn to profitability, despite the disappointing third quarter 2013 financial results, which was usually its strongest, and the tepid fourth quarter 2013 guidance, the Company's stock price closed up 3.3% that day, closing at

$15.74 per share. According to Peter Wahlstrom, an analyst at Morningstar, Inc., the price of the Company's common stock increased because "people [were] getting more comfortable with management's ability to change the Nook model to make it more viable, and that could lead to the unlocking of value through separation."

34.     On March 7, 2013, the Company filed a quarterly report for the period ended January 26, 2013, on a Form 10-Q with the SEC signed by, among others, Defendants Lynch and Huseby.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Lynch and Huseby stating that the financial information contained in the Form 10-K was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

35.     Regarding its separate segment reporting, the Company stated in relevant part:

> B&N Retail sales for the 39 weeks ended January 26, 2013 decreased $179.8 million, or 4.7%, to $3.62 billion from $3.80 billion during the same period a year ago, and accounted for 65.1% of total Company sales. The decrease was attributable to a 1.9% decrease in comparable store sales, which decreased sales by $59.4 million and lower online sales, which declined by $74.0 million. Core comparable store sales, which exclude sales of NOOK products, increased 1.8% as compared to the prior year. Sales of NOOK products in the Retail segment declined due to lower unit volume. Closed stores decreased sales by $51.4 million, offset by new stores that increased sales by $3.8 million. B&N Retail also includes third-party sales of Sterling Publishing Co., Inc.
>
> B&N College sales decreased $4.8 million, or 0.3%, to $1.51 billion during the 39 weeks ended January 26, 2013 from $1.52 billion during the 39 weeks ended January 28, 2012. The decrease was attributable to a 2.3% decrease in comparable store sales which decreased sales by $56.7 million. The back-to-school rush season extended past the close of the Company's third fiscal quarter, factoring in the two additional weeks in February that contributed to this year's rush season, comparable store sales decreased 1.3% for the 39 weeks ended January 26, 2013. In addition closed stores also contributed to the decrease in sales by $14.5 million while new stores increased sales by $66.2 million. Sales were impacted by the continued growth of textbook rentals, which have a lower price than new or used textbooks, and a portion of rental sales are deferred over the rental period.

NOOK sales decreased $101.6 million, or 13.2%, to $668.3 million during the 39 weeks ended January 26, 2013 from $769.9 million during the 39 weeks ended January 28, 2012. This decrease was primarily due to lower device unit volume, $21.2 million of incremental channel partner returns given the holiday sales shortfall, and $15.4 million of promotional allowances to optimize future sales opportunities, partially offset by higher content sales. Digital content sales increased 27.9% during the 39 weeks ended January 26, 2013.

The elimination represents sales from NOOK to B&N Retail and B&N College on a sell through basis. Lower than last year due to lower device sales by B&N Retail.

36.     On March 18, 2013, the Company amended its employment agreement with Defendant Lynch, explicitly providing that Defendant Lynch would: (i) receive a $1.8 million cash bonus for facilitating the Microsoft and Pearson investments; (ii) receive 300,000 restricted stock units that would not vest for three years, and would not vest at all if Lynch was fired "for cause" in the interim, but would entitle Lynch to receive any dividend payments declared on those shares prior to their vesting; and (iii) *critically,* provided the Company with the right to assign Lynch's employment to NOOK as CEO of NOOK in connection with any separation of NOOK from the Company, and providing that in the event of such an assignment, Lynch would be entitled to a cash retention bonus in the amount of $1.5 million that he would be required to repay in full if his employment was terminated "for cause" during the first year following NOOK's separation from Barnes & Noble. Essentially, this set the stage for spinning off NOOK from Barnes & Noble to facilitate a sale of the B&N Retail assets to Defendant Riggio.

37.     Then, on May 9, 2013, *Tech Crunch* reported that it had reviewed Microsoft documents obtained from confidential sources demonstrating that Microsoft was in the process of making a $1 billion offer to purchase the entire NOOK operating segment. As *Forbes* reported that day: "Microsoft offered $1 billion for the Nook business, after investing $300 million in it

last April. . .. TechCrunch, which broke the news, says internal documents show a $1.66 billion valuation for the Nook." The *New York Times' Dealb%k* added "[s]hares of Barnes & Noble skyrocketed in early trading ... after a report said Microsoft was offering $1 billion for the digital assets of the bookseller's e-reader business." *Reuters* confirmed that "[a] source familiar with the documents cited by TechCrunch confirmed their authenticity," adding that while "[i]t was not clear from the TechCrunch story whether Microsoft had formally made an offer to B&N or whether B&N had replied," "B&N and Microsoft declined to comment," ***including refusing to deny the rumor.*** *Bloomberg News* reported that "Barnes & Noble jumped the most in a year following a report that Microsoft [] is planning to offer $1 billion to buy the Nook Media unit." *The Wall Street Journal's* report that day captioned "B&N Investors See Windows Open" stated that "[w]hile the report hasn't been confirmed-the companies were mum-the market's reaction shows investors are hungry for B&N to do something about the Nook business. And Microsoft, especially at that price, would be a sweet solution." *CNN Money* emphasized that same day that: "a $1 billion check could be the bookseller's saving grace." The Company's stock price closed up 24% on May 9, 2013. Then over the next several days, as media outlets around the country reported that when directly questioned, Barnes & Noble continued to refuse to deny the billion dollar Nook buyout rumor, the price of Barnes & Noble's stock price continued spiraling, trading above $23 in intraday trading by May 13, 2013.

38.   The statements referenced in ¶¶ 23 - 37 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them that: (1) Nook sales were significantly diminishing during the Company's fourth quarter 2013 (ended April 27, 2013); (2) the Nook segment was on track to lose money and the Company was not committed to sustaining

the money losing segment; (3) the Company engaged in improper accounting practices, including by inappropriately allocating expenses between the Company's NOOK and Retail segments; (4) the Company lacked adequate internal controls over financial reporting; and, (5) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## THE TRUTH SLOWLY BEGINS TO EMERGE

39.     On June 25, 2013, the Company announced that it would not be able to file its annual report on time, and would need to evaluate its prior financial statements in order to provide investors with accurate financial statements. The Company stated in relevant part:

> The Annual Report on Form 10-K of Barnes & Noble, Inc. (the "Company") for the fiscal year ended April 27, 2013 (the "2013 10-K") will not be filed with a filing date of June 26, 2013 (the "Filing Deadline"). As previously announced, the Company is currently in the process of evaluating certain prior year amounts, which may result in a revision to the financial statements. The Company's analysis is ongoing, but it does not believe these amounts will be material to the financial statements. As the Company is currently still evaluating certain prior year amounts, the Company was not able to complete and file the 2013 10-K prior to the Filing Deadline. Also, the Company's ongoing evaluation of prior year amounts may result in revisions to its previously filed financial statements and changes to the financial information presented in its press release furnished with the Securities Exchange Commission as an exhibit to Form 8-K on June 25, 2013.

40.     On this news the Company's shares fell $3.21 to close on June 25, 2013 at $15.61 per share, a one day decline of 17% on volume of nearly 9 million shares.

41.     Then, on December 5, 2013, the Company announced in its Form 8-K, that, "on October 16, 2013, the SEC's New York Regional office notified the Company that it had commenced an investigation into: (1) the Company's restatement of earnings announced on July 29, 2013, and (2) a separate matter related to a former non-executive employee's allegation that the Company improperly allocated certain Information Technology expenses between its NOOK

and Retail segments for purposes of segment reporting. The Company is cooperating with the SEC, including responding to requests for documents."

42.     On this news, Barnes & Noble securities declined $1.96 per share, or over 11%, to close at $14.43 per share on December 6, 2013, on volume of over 7 million shares.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Barnes & Noble securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Barnes & Noble securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Barnes & Noble or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

16

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Barnes & Noble;

- whether the Individual Defendants caused Barnes & Noble to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Barnes & Noble securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

49.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Barnes & Noble securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Barnes & Noble securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

**(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Barnes & Noble securities; and (iii) cause Plaintiff and other members of the Class to purchase Barnes & Noble securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

55.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Barnes & Noble securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Barnes & Noble's finances and business prospects.

56.     By virtue of their positions at Barnes & Noble, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and

intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Barnes & Noble, the Individual Defendants had knowledge of the details of Barnes & Noble internal affairs.

58.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Barnes & Noble. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Barnes & Noble's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Barnes & Noble securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Barnes & Noble's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Barnes & Noble securities at artificially inflated prices and

relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

59.     During the Class Period, Barnes & Noble securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Barnes & Noble securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Barnes & Noble securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Barnes & Noble securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<u>COUNT II</u>

**(Violations of Section 20(a) of the**
**<u>Exchange Act Against The Individual Defendants)</u>**

62.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.     During the Class Period, the Individual Defendants participated in the operation and management of Barnes & Noble, and conducted and participated, directly and indirectly, in the conduct of Barnes & Noble's business affairs.  Because of their senior positions, they knew the adverse non-public information about Barnes & Noble's misstatement of income and expenses and false financial statements.

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Barnes & Noble's financial condition and results of operations, and to correct promptly any public statements issued by Barnes & Noble which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Barnes & Noble disseminated in the marketplace during the Class Period concerning Barnes & Noble's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Barnes & Noble to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Barnes & Noble within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Barnes & Noble securities.

66.     Each of the Individual Defendants, therefore, acted as a controlling person of Barnes & Noble.  By reason of their senior management positions and/or being directors of Barnes & Noble, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Barnes & Noble to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Barnes & Noble and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Barnes & Noble.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   January 24, 2014

23

**POMERANTZ LLP**

Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
lfpornoy@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

24